**In the Matter of PAT FREEMAN, INC. dba Tiffany's Supper Club.**

**Bankruptcy No. 3–83–00901.**

United States Bankruptcy Court, S.D. Ohio, W.D.

Aug. 16, 1984.

Ronald S. Pretekin, Dayton, Ohio, for debtors.

Milton L. Sprowl, Dayton, Ohio, trustee.

Wendell D. Sellers, Dayton, Ohio, for plaintiff Loudin.

C. Dino Gianuglou, Dayton, Ohio, for defendant DeWitt.

## DECISION

CHARLES A. ANDERSON, Bankruptcy Judge.

The Court has been asked to determine the validity and priority of certain liens on the personal property of the debtor corporation, Pat Freeman, Inc., dba Tiffany's Supper Club, in connection with a proposed sale of debtor's interest by the trustee in bankruptcy.

Defendant Stephen W. DeWitt [DeWitt] and the late James L. Freeman [Freeman] were the original officers and shareholders of the debtor, previously at that time known as DeWitt-Freeman, Inc., dba Tiffany's Supper Club.

Subsequently, DeWitt sold his interest to Freeman, who died, leaving his wife, Patricia A. Freeman as the sole shareholder and officer.

Originally, on April 24, 1980, plaintiff, D.H. Loudin had entered into an agreement

to sell to debtor, DeWitt as an individual and Freeman as an individual his restaurant known as "The Black Knight", including the real estate upon which it was located. The Purchase Agreement specifically *inter alia* provided:

5. Buyers will simultaneously with the execution of this agreement perform the following:

\* \* \* \* \* \*

(b) Execute and deliver to the Escrow Agent, a personal promissory note, with acceleration provisions, in the amount of Three Hundred Twenty Thousand Dollars ($320,000.00) ...

(c) Execute and deliver to the Escrow Agent, a financing statement setting forth each and every item set forth in Exhibit "B" to be recorded with the Montgomery County Recorder's Office and also with the Office of the Secretary of State, Columbus, Ohio.

The Agreement further specified "2. That Winfield E. Kinney, III and Wendell D. Sellers [Parties' attorneys] shall act as the escrow agent and hold the necessary documents and deposits delivered in accordance with the provisions of this Agreement."

Although the Purchase Agreement called for the execution and filing of a financing statement, the buyers never executed and delivered to the escrow agents such a statement. Thus, Loudin's financing statement was never filed.

Of the total $320,000 sale price, $300,000 was attributable to the sale of the realty which was evidenced by a Land Contract dated April 24, 1980, signed by DeWitt and Freeman as individuals only. Thus, debtor corporation never has had an interest in this Land Contract, as stipulated by Loudin and DeWitt. Paragraph 7 of this Contract provided that "Buyers further agree not to assign any of their rights hereunder nor any part thereof without first obtaining the written consent of Seller, which the Seller shall not unreasonably withhold."

Although the Purchase Agreement also called for the personal signatures of De-

Witt and Freeman upon the promissory note payable to Loudin, that note was executed by them only in their capacities as officers of the debtor on July 16, 1980. That Note included the following language:

AFTER DATE, for value received, the undersigned jointly and severally promise to pay to the order of D. H. LOUDIN of 2115 Dorothy Lane, Kettering, Ohio 45429, the sum of THREE HUNDRED TWENTY THOUSAND DOLLARS ($320,000.00), payable as follows ...

The maker and endorser hereof hereby authorize [sic] any attorney at law to appear in any court of record of the State of Ohio or any other State in the United States at any time after this note becomes due, whether by acceleration or otherwise, and to waive the issuing and service of process and confess a judgment in favor of the legal holder hereof against the maker and endorser or either or any one or more of them, for the amount of principal and interest then appearing due upon this note, together with costs of suit and to release all errors and waive all right of appeal.

The maker and endorser hereof hereby waives presentment, demand notice of dishonor, protest notice of non-payment and protest. Each of the undersigned has executed this instrument in the capacity of maker, regardless of the location of his signature.

After receipt of the down payment and in accordance with the Purchase Agreement, Loudin executed and delivered a Bill of Sale, dated July 16, 1980, which transfered the restaurant's personal property to the three buyers: debtor corporation, DeWitt, and Freeman.

On April 21, 1981, DeWitt transferred and assigned to debtor all his interest and shares of stock of debtor in a Stock Transfer Agreement, which provided in part:

3. Corporation, in consideration of the execution of this agreement, shall pay DeWitt for his One Hundred (100) shares of Common Stock identified by Share Certificate # 2, the sum of Forty Thou-

sand Dollars ($40,000.00), which shall be paid in the following manner:

\* \* \* \* \* \*

d. As additional security for full payment, Corporation shall deliver to DeWitt duly executed UCC Form 1 financing statements, as described in Exhibit A attached hereto, covering all assets of the Corporation owned as of April 21, 1981.

Also on April 21, Freeman, on behalf of debtor, signed a promissory note for $30,000 payable to DeWitt. That Note stated in part:

Payment of this note shall be secured by a Financing Statement of even date whereby the maker hereof shall grant a security interest in certain property to STEPHEN W. DEWITT to secure the payment of this note.

On May 4, 1981, DeWitt assigned his interest in the Land Contract to Freeman without first obtaining Loudin's written permission, as required.

On May 5 and 6, 1981, DeWitt filed with the County Recorder and the Ohio Secretary of State financing statements in his own behalf on debtor's personal property (substantially the same property—trade fixtures—sold earlier by Loudin).

As noted above, Freeman died shortly thereafter and left all his interest in the restaurant to his wife, Pat Freeman, who subsequently changed debtor's name to Pat Freeman, Inc, dba Tiffany's Supper Club.

On March 18, 1983, Pat Freeman, Inc. filed a voluntary Chapter 11 petition in bankruptcy. On its schedules, Loudin was listed as a secured creditor for approximately $260,000 while DeWitt was listed as unsecured for $19,500.

On May 9, 1983, DeWitt filed his proof of claim for $19,650, claiming priority because of an alleged security interest in debtor's trade fixtures.

Because of debtor's failure to file a Plan of Reorganization and the Court's finding that there was no possibility of an effective reorganization, this case was converted to Chapter 7 on November 3, 1983.

On December 15, 1983, Loudin filed his proof of claim for $311,041.50, claiming priority because of an alleged security interest in debtor's trade fixtures.

Loudin then filed on 20 December 1983 a Complaint for Disallowance of DeWitt's proof of claim or for equitable subordination pursuant to 11 U.S.C. § 510(c)(1).

On the next day, the Trustee in Bankruptcy filed his notice to sell debtor's personal property (the trade fixtures in question) subject to any valid lien.

On January 9, 1984, Loudin objected to the sale and requested a hearing, which was held on February 13, 1984. At that hearing, this objection was continued pending the outcome of the instant adversary.

This adversary was set by the court for a hearing on March 29, 1984.

On April 2, 1984, the Trustee filed a memorandum requesting the court to find that neither lien claimant, Loudin nor DeWitt, has a valid security interest. This was followed by an appropriate motion for such relief on April 11, in which the Trustee claims that both Loudin and DeWitt failed to meet the requirements of O.R.C. § 1309.14(A)(1) (UCC 9–203), which requires a signed security agreement in addition to the filing of financing statements. This matter was then consolidated with the instant adversary for adjudication.

At a pretrial conference on May 31, 1984, the parties were allowed two weeks for any additional briefs, which were duly filed.

Plaintiff Loudin generally relies on 11 U.S.C. § 510(c) in requesting this Court to find that DeWitt's lien against the fixtures be equitably subordinated to Loudin's lien, in light of DeWitt's alleged inequitable conduct in failing 1) to execute and deliver to the escrow agents a financing statement and then later filing his own and 2) to obtain Loudin's permission to assign his interest in the Land Contract to Freeman.

Defendant DeWitt counters that this Court lacks jurisdiction, that his lien is good and should not be subordinated, and that the original Purchase Agreement was

merged under Ohio Law into the Land Contract and Bill of Sale.

Debtor and the Trustee allege that neither lien is valid and that the property should be used for the benefit of all creditors.

## DECISION

### I. Jurisdiction

In his Motion for Summary Judgment filed on February 24, 1984, DeWitt argues, in response to Loudin's claim that this court has equitable jurisdiction to provide the requested relief, as follows:

> ... Plaintiff is attempting to use a Chapter 11 statute, 11 U.S.C. § 510 in a Chapter 7 proceedings [sic].
>
> There is nothing in the U.S. Bankruptcy Code that indicates that the provisions of Chapter 11 apply to the provisions of Chapter 7, and for this reason, it is the Defendant, Stephen W. DeWitt's position that this Court does not have jurisdiction over the equitable relief requested by the Plaintiff and against this Defendant.

DeWitt misinterprets the law. Section 510(c) is specifically made applicable to proceedings in Chapter 7 by 11 U.S.C. § 103(a): "Except as provided in section 1161 of this title, chapters 1, 3, and 5 of this title apply in a case under chapter 7, 11, or 13 of this title."

Furthermore, § 105(a) states: "The bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title". Additionally, 28 U.S.C. § 1481 states: "A bankruptcy court shall have the powers of a court of equity, law, and admiralty."

■ The instant adversary is basically one of determining the validity and priority of two alleged liens in connection with a sale by the trustee in bankruptcy. Such a determination is manifestly a typical, traditional core bankruptcy proceeding, over which this Court has jurisdiction.

The Circuit Courts of Appeals have delineated the jurisdiction of the bankruptcy courts by adopting the Model Rule, which reads in pertinent part:

> (d) Powers of Bankruptcy Judges
>
> (1) The bankruptcy judges may perform in referred bankruptcy cases and proceedings all acts and duties necessary for the handling of those cases and proceedings except that the bankruptcy judges may not conduct:
>
> (A) a proceeding to enjoin a court;
>
> (B) a proceeding to punish a criminal contempt—
>
> (i) not committed in the bankruptcy judge's actual presence; or
>
> (ii) warranting a punishment of imprisonment;
>
> (C) an appeal from a judgment, order, decree, or decision of a United States bankruptcy judge; or
>
> (D) jury trials.

Those matters which may not be performed by a bankruptcy judge shall be transferred to a district judge.

The determination of lien validity and priority is "necessary for the handling" of bankruptcy cases. Thus, bankruptcy judges may make such determinations, since they were not specifically prohibited.

■ Furthermore, by filing his proof of claim with this Court, DeWitt invoked the jurisdiction of the bankruptcy court to allow his claim subject to any objections. Loudin has filed such an objection. DeWitt is deemed to have consented to the Court's adjudication of his claim vis-a-vis the objection thereto.

Pursuant to Bankruptcy Rule 3006, creditors may withdraw a claim anytime except after an objection is filed. After an objection has been filed, an order of the bankruptcy court is necessary to withdraw such claim. DeWitt has not moved this Court for such an order granting leave to withdraw his claim.

Without dwelling on the obvious, the powers of a bankruptcy court to subordinate claims or to adjudicate equities arising out of the relationships among the several creditors of a debtor have been deemed complete. See *Sampsell v. Imperial Pa-*

*per & Color Corp.* (1941) 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293.

See, this court's opinion in *Matter of Concord Storage and Warehouse Company, Inc., et al.,* 40 B.R. 831 (Bankr.S.D.Ohio 1984).

## II. Lien Validity

In order to have a perfected security interest, unless the creditor has possession of the collateral, 1) the creditor must have executed a security agreement signed by the debtor that describes the collateral, O.R.C. § 1309.14(A)(1) (U.C.C. 9–203), 2) value must have been given, O.R.C. § 1309.14(A)(2), 3) the debtor must have rights in the collateral, O.R.C. § 1309.-14(A)(3), and 4) the creditor must have filed a financing statement, O.R.C. § 1309.21 (U.C.C. 9–302).

■ Turning first to Loudin's alleged security interest, the Court notes that no financing statement was ever filed; thus, Loudin has no security interest in the collateral fixtures as to the Trustee in bankruptcy, who holds a hypothetical judgment creditor lien.

■ As to DeWitt's claim, the Court need only consider whether a valid, signed security agreement describing the collateral was executed, since the other requirements have been met, as outlined above.

This Court has previously held on numerous occasions that if a financing statement has been duly executed and complies with the statutory requirements for both a security agreement and financing statement, a separate security agreement is not necessary if the parties intended a security interest by the signing of the financing statement to be filed. See opinion *In Re Shaffner* (1966) Case No. 23688 (at Dayton).

\* \* \* \* \* \*

The opinion in *Shaffner* rationalizes that the Uniform Commercial Code requires no special terminology, and the formal requisites of a financing statement conformably to Ohio Revised Code § 1309.39 (U.C.C. 9–402(1)) include the

minimal requirements for a security agreement prescribed by Ohio Revised Code § 1309.13 (U.C.C. 9–203). Also, a promissory note might likewise constitute a security agreement. Realistically, the fact that a debtor executes a financing statement should not be deemed insignificant; and third parties searching the public files surely are on notice of the substance of the claimed collateral. A "grant" clause can certainly even be oral if such is the intention of the parties. The function of a security agreement as a matter of elementary and fundamental contract law is merely to evidence the intention of the contracting parties. *Matter of Dayton Suzuki, Inc.* 27 B.R. 915, 916–17, 35 UCC Rep 969 (Bankr. S.D. Ohio 1983). *See, also White Motor Credit Corp. v. Euclid Nat. Bank,* 30 UCC Rep 331 (Cuyahoga County Ct.App.1980), aff'g 63 Ohio Misc. 7, 409 N.E.2d 1063 (Ct.Com. Pleas, Cuyahoga County, 1978).

Turning to the instant facts, the Court is satisfied that the parties intended to create a security interest in both the Stock Transfer Agreement and the promissory note, both dated April 21, 1981. Thus, DeWitt's security interest is valid against the Trustee in bankruptcy.

The Trustee's statutory lien remains fixed as of the date of filing; it is unaffected by any application of equitable subordination, except as hereinafter noted.

## III. Lien Priority

■ Loudin urges this Court to subordinate equitably DeWitt's valid secured interest in the trade fixtures to Loudin's unsecured claim, primarily because DeWitt and Freeman failed to execute and deliver to the escrow agents a financing statement as required by the April 24, 1980 Purchase Agreement. DeWitt argues in his April 6, 1984, post-trial brief that the doctrine of merger under Ohio case law applies:

Plaintiff states the inequitable conduct in this case as being the Defendant's failure to file certain finance statements. However, the Land Contract in which the purchase agreement merged, did not call

for the filing of said financing statements. It is well known that where the delivery of a deed is provided for as an execution of a prior agreement, the prior agreement is merged into the deed when the latter is delivered, and no cause of action upon the prior agreement can then be had, but the rights of the parties must be determined by the deed so given in execution of the prior agreement, unless the elements of fraud or mistake are involved. *Birnbryer v. Lehman*, 19 ONP NS 206 (1916).

There has been no allegation by the Plaintiff as fraud or mistake in this case. Under the Land Contract, the Defendant, Stephen DeWitt, simply was not required to file any financing statements.

This Court disagrees; the doctrine of merger would not apply in this fact situation. Here, the delivery of the deed was only *partial* performance of the prior Purchase Agreement.

DeWitt relies on *Birnbryer* but, although never formally overruled, this case and the doctrine followed therein have been questioned and circumscribed in more recent cases. *See, e.g. Galvin v. Keen,* 100 Ohio App. 100, 135 N.E.2d 769 (1954); *Triplett v. Ostroski*, 103 Ohio App. 290, 145 N.E.2d 209 (1957); *Richmond Homes, Inc. v. Lee-Mar, Inc.*, 20 Ohio App.2d 27, 251 N.E.2d 637 (1969); *Medeiros v. Guardian Title & Guar. Agency, Inc.*, 57 Ohio App.2d 257, 387 N.E.2d 644 (1978); and cases cited therein.

This Court agrees with the conclusion in 54 O.Jur.2d *Vendor and Purchaser* § 70 (1962) at pp. 621–622:

> The true rule seems to be that where a contract provides for the transfer of the title to real estate, and nothing else, the deed conveying the title is in fact full performance and is accepted as full performance of the contract and in such a case the contract can properly be said to be merged in the deed; but where the contract contains many provisions relating to more than one subject, one of which provides for the transfer of title to real estate, the transfer of title to the real estate is only part performance of the obligations and can in no sense be said to be performance of all the obligations or to have been intended as actual or substitute performance. The deed is to be considered as a part of the transaction, in connection with, and not to the exclusion of, the contract between the grantor and grantee; and the rights of the parties must be determined by the terms of the whole contract, including the deed and the contract. There is no presumption that a party, in giving or accepting a deed, intends to give up the covenants of which the deed is not a performance or satisfaction.

In the instant facts, the Purchase Agreement dealt with numerous subjects: the sale of an ongoing restaurant business, the sale and transfer of a liquor license, Loudin's noncompetition agreement, Loudin's hold harmless agreement, the sale of the restaurant's fixtures and the sale of the realty. It is clear that transfer of title to the realty was only part performance of the contractual obligations. Thus, this court cannot say that the agreement for buyers to execute and deliver a financing statement on the business fixtures was merged into the Land Contract. Rather, the rights of the parties must be determined by the terms of the Purchase Agreement.

Having thus held that merger did not relieve Loudin and Freeman of their contractural obligation to execute and deliver the financing statement, the Court now addresses the issue of whether such failure to execute and deliver can be a ground to equitably subordinate DeWitt's secured claim to Loudin's claim.

█ Loudin and DeWitt agree that for equitable subordination per 11 U.S.C. § 510(c)(1) to apply, the following conditions must be present:

1) the claimant must have engaged in some type of inequitable conduct;
2) the misconduct must have resulted in injury to the creditors of the bankrupt

or conferred an unfair advantage on the claimant;

3) the application of equitable subordination must not be inconsistent with the provisions of the Bankruptcy Act.

(These conditions were enunciated in the pre-Code case of *In Re Mobile Steel Co.*, 563 F.2d 692, 699–700, 3 B.C.D. 1170, 15 CBC 1, BLD (CCH) ¶ 66632 (5th Cir.1977).)

In *Allied Technology, Inc. v. R.B. Brunemann & Sons*, 25 B.R. 484, 499 (Bankr. S.D.Ohio 1982), this Court stated: "Subordination is essentially a discretionary exercise of the Court's equitable powers, and should only be used sparingly to rectify obvious inequities... Generally, a claim may normally be subordinated only if its holder is guilty of misconduct."

DeWitt argues that since "almost all of the cases" dealing with equitable subordination involve fiduciary duties and that since the instant facts present no fiduciary duty, "this is not a proper situation for the application of the principle of equitable subordination."

Just because most cases might involve fiduciaries does not mean that subordination is unavailable to those that do not involve fiduciaries. The mere absence of a fiduciary, standing alone, does not preclude application of the doctrine of equitable subordination. Turning to the instant facts, the Court is satisfied that DeWitt's claim should be subordinated to Loudin's claim.

It was clearly inequitable for DeWitt, given his contractual duty to execute and deliver a financing statement on behalf of Loudin, to gain secured status by filing his own statement. The Court notes that if DeWitt had met his contractual obligations in full, his secured claim would be secondary to Loudin's claim. By contriving to obtain first priority on the collateral, DeWitt was unfairly advantaged and this Court cannot countenance such misconduct as a court of equity.

Furthermore, DeWitt failed to request Loudin's written permission before assigning his rights under the Land Contract, again in violation of his contractual obligations in the Purchase Agreement. While such permission would undoubtedly have been given, the request was nonetheless required, ostensibly to keep Loudin informed. Arguably, had Loudin been informed, he may have discovered that no financing statement had been executed and delivered to the escrow agents for them to file on his behalf.

Since Loudin acted in this Court as soon as he learned that his statement had not been filed, laches would not bar equitable subordination.

DeWitt has not shown the Court how application of this doctrine of equitable subordination in this case would be inconsistent with any other provision of the Code.

█ It is ordered that DeWitt's secured claim is equitably subordinated in priority of distribution to Loudin's unsecured claim, to the extent that Loudin's claim is allowed by the Trustee.[1] The subordinated portion of DeWitt's claim will be paid after all unsecured claims of the same class are paid (since Loudin is an unsecured creditor); the portion of DeWitt's claim, if any, which is not subordinated (since it exceeds Loudin's allowed claim) maintains its secured priority status and will be paid as secured to the extent of the value of the collateral in excess of the amount of the DeWitt claim as allowable. *See Benjamin v. Diamond (In the Matter of Mobile Steel Corp.)*, 563 F.2d 692 (5th Cir.1977), 3 B.C.D. 1170, 15 C.B.C.1, CCH Bankr.L.Rptr. ¶ 66,632; and 1A Bkr-L.Ed. § 7:62–7:66.

To effectuate the above order, it is further ordered that, pursuant to § 510(c)(2), DeWitt's lien against the business fixtures is transferred to the Trustee, to the extent

---

1. While the trustee has not yet determined whether to allow Loudin's claim at all or, if so, in what amount, the Court notes that part of Loudin's claim appears to be based on the Land Contract. But, as stated above, Loudin has stipulated that debtor has never had an interest in the Land Contract. Any claim not involving the debtor or property of the debtor's estate is not justiciable in this Court.

of subordination (to the extent that Loudin's claim is allowed by the Trustee). Except as noted above, the Trustee's lien remains unaffected.

The subordination for the purposes of distribution of the payment of DeWitt's claim in priority to the payment of Loudin's claim to that extent relegates DeWitt's secured claim to an unsecured status and does not convert Loudin's unsecured claim into a secured claim. The trustee's statutory lien intervenes in behalf of all unsecured claims. The lien securing the subordinated claim is transferred to the estate for the benefit of all creditors. See 11 U.S.C. § 510(c)(2). Since Loudin's claim is unsecured, his distributive share of the estate should not be given a priority over other unsecured creditors since his claim was never perfected as secured under Ohio law.